And the court now calls case 118181, People of the State of Illinois v. Jacob D. Timmsen. Are you ready to proceed? We are, Your Honor. Defense ready? May I move the microphone? Of course. We want to make sure we hear you, and it's recorded. Thank you. That's very important. Good morning, Your Honors. May it please the court, counsel. I'm Drew Meyer of the Illinois Attorney General's Office, and I represent the people of the State of Illinois, the appellant. Your Honors, this court should reverse the judgment of the appellate court below for two independent reasons. First, defendants who turned 17 yards away from a clearly marked, well-lit police road safety checkpoint at Saturday morning at 115 generated reasonable suspicion according to the totality of the circumstances test, the governing totality of the circumstances test. Second, the officer who made the stop, Deputy Travis Duffy, made a reasonable mistake of law in concluding that defendant had violated Section 11706 of the Vehicle Code. Turning first to the totality of the circumstances test, there are at least five specific and articulable facts on the face of the record that generated reasonable suspicion in this case. First, the inherently suspicious U-turn itself. Second, the close proximity of the U-turn to the checkpoint. Third, the date and time, Saturday morning at 115. Fourth, the fact that the checkpoint was well-lit, clearly marked. Fifth, the fact that the checkpoint was not busy. If this were on a Tuesday at 2.30 in the afternoon, would it make a difference? It would absolutely make a difference, Your Honor. The totality of the circumstances test is highly fact-sensitive, fact-specific. So that would weigh, in this case, as this court held in People v. Bartley, drunken driving is much more likely to occur at night than, as Your Honor hypothesizes, at 2.30 in the afternoon. So that would make a difference, Your Honor. Although the U-turn itself in this case is the motorist's equivalent of headlong flight in Illinois v. Wardlow. So the U-turn itself weighs heavily in its totality of the circumstances test. But in answer to your question, yes, Your Honor, that would make a difference. Turning to the U-turn itself, as I said, the U-turn in front of a police checkpoint is the motorist's equivalent of headlong flight. And the principles of Wardlow apply readily to drivers evading police checkpoints. The U-turn, as a maneuver, is blatantly evasive, and it is entirely inconsistent with going about one's business. Therefore, it is, as the Supreme Court held in Wardlow, the very opposite of going about one's business. And it does not interfere with the right of a pedestrian to ignore police and go on his way. Which leads to another point. The cases that deal with reasonable suspicion or flight from police in a pedestrian setting are only partially applicable to a case like this. As this Court held in Fink v. Ryan, because driving is such a heavily regulated activity, the expectation of privacy of a motorist is accordingly reduced. So this is more like, in the pedestrian situation, the individual that runs the opposite direction when they see the police versus the one that the individual keeps on walking past. Absolutely, Your Honor. In fact, the pedestrian equivalent of headlong flight is this U-turn, where there is, especially given the geographical scenario in which this took place, where there were no commercial or residential destinations accessible via the U-turn. This was not a turn onto a residential street or a turn into a parking lot of a business. This was headlong flight back along the bridge across the Mississippi River back to Iowa. And it should be noted that the next closest crossing of the Mississippi River was 25 miles north at Fort Madison, Iowa, which belies any notion that the defendant hoped to save time by taking an alternate route and avoiding the checkpoint. Mr. Meyer, is it the State's position that if a person wants to avoid an encounter with a police officer, that fact by itself creates a reasonable suspicion of criminal wrongdoing? No, Your Honor. One is free to attempt to avoid an encounter with police, but if in doing so, one generates reasonable suspicion, again, given the totality of the circumstances, then one is justly subject to a brief investigative stop. As this court held in People v. Close, the purpose of the Terry stop is that the officer whose suspicion has been peaked can investigate further briefly and either confirm or dispel his suspicions. So in answer to your question, Your Honor, again, it comes down to well-established totality of the circumstances test. And in this case, the evasive maneuver weighs heavily in that analysis. If one can attempt to avoid an encounter with police, can you give us an example of that that would be not a reasonable suspicion? Or the concern is, is every attempt to avoid contact with the police seem to be reasonable suspicion? Where does it fall? Where's the line? Well, and that's why these analyses are so fact-specific, Your Honor. It's going to be different in every case. Well, say in this case. Let's say the driver just doesn't want to encounter the police. Absolutely, Your Honor. And let's say he was an innocent motorist, which we know he was not. Innocent motorist, the explanations, the innocent explanations for his maneuver in this case proposed by the defendant and proposed by the concurrence below are implausible, to say the least. That he suddenly remembered that he forgot something in Iowa, that he missed a turn in Iowa, that he wanted to avoid delay by going through an empty police checkpoint. Or avoid encountering the police. But if he wants to simply avoid encountering the police, in this case, by executing this U-turn at this place at this time, he generated reasonable suspicion, sufficient for a Terry stop. So there's no way for, just to finish my question, there was no way for this motorist to avoid encountering the police without raising reasonable suspicion? That is correct, Your Honor. At this place, this time, and these specific facts, because a U-turn was, there was a turn off onto the Montebello State Park nearby. Perhaps, and again, totally hypothetically, perhaps if the defendant had manifested a desire to reach a destination inside the state park, that would have been a way to avoid the police encounter because it would be more probable, under the totality of the circumstances, that he was simply going about his business and wanted to visit the state park. Although, at this time, this place, his maneuver was highly suspicious. And again, a U-turn is the motorist equivalent of headlong flight in war club. Who prepared the bystander's report? I beg your pardon, sir? Who prepared the bystander's report? The bystander's report, as far as I know, was prepared by both attorneys. It was signed by both attorneys. And what facts in that report supports a reasonable suspicion of criminal activity? Same facts you've mentioned so far? Yes, Your Honor. The facts that I've mentioned were facts that were memorialized in the bystander's report as well as facts that were found by the trial court in its order denying defendants' motion to suppress, as well as from the record in general. Briefly, the suspicion generated by the U-turn was augmented by several other factors. Proximity to the checkpoint, only 17 yards away, far closer than evasive maneuvers that generated reasonable suspicion in a variety of other cases, which we list at page 13 of our brief. The time, again, of day and the day of the week make it more likely that there was criminal activity afoot. The checkpoint was well marked and lit, which belies the notion that the defendant had any innocent fear of road hazard or inordinate delay. And his hypothetical fear of inordinate delay, cited by the concurrence below, is also belied by the fact that the checkpoint was not busy. There's no evidence that there were any other cars, and there certainly were no more cars than could fit into the 17 yards between the U-turn and the checkpoint. The majority considered none of these factors in contravention of the totality of circumstances test, and its holding is flawed as a result. Both the majority in the concurrence below and defendant err in relying on the potential innocence of the conduct at issue. Innocent conduct, as this court and the United States Supreme Court have consistently held, may form the basis for reasonable suspicion, warranting a brief investigative stop to determine whether or not criminal activity is indeed ongoing. Justice Tice, going back to your question about an innocent desire to simply avoid police with no criminal activity going on, as Wardlow pointed out, its holding is entirely consistent with the innocent pedestrian's desire to ignore police and go about his business. As Wardlow reasoned, the Fourth Amendment itself, as well as all of Fourth Amendment jurisprudence, accepts the possibility that an innocent person might be stopped for a brief investigative stop. And so while it is possible that an innocent person would be stopped for this reason, this is something that is reasonable in the grand scheme of Fourth Amendment jurisprudence. Briefly, Your Honors, the court should reject defendant's attempt to overlay or superimpose a separate balancing test on a governing totality of the circumstances analysis. As the Supreme Court noted in United States v. Arvizu, the reasonable suspicion requirement itself strikes this correct balance between the public interest and the individual's right to personal security. So that balancing concern is already incorporated into the totality of the circumstances test. Very briefly, regarding our argument pursuant to Hyen v. North Carolina, the recent United States Supreme Court case, there was a reasonable mistake of law here that the deputy made in believing that defendant's right to personal security had violated Section 11706 of the Vehicle Code. Important to note that it is undisputed that defendant violated Section 11706A, which prohibits driving on the left side of the roadway within 100 feet of any railroad grade crossing. When it got to the trial court, the defendant raised the defense available to him in subsection B, which accepts, carves out such maneuvers, quote, upon a roadway with unobstructed pavement of sufficient width for two or more lanes of moving traffic in each direction. The designation of this roadway as obstructed, and therefore not within the purview of subsection B, was reasonable given the fact that there was a concrete barrier that bisected this roadway, and the fact that the Illinois Department of Transportation designated it as a divided roadway. Very briefly, Your Honors, as we note in our opening brief, the conclusion pursuant to Hyen v. North Carolina that this was a reasonable mistake of law, and that therefore the deputy who made the stop had reasonable suspicion to make the stop, is consonant with this Court's decision in People v. Close from 2010, which held that if an officer has reasonable, excuse me, excuse my sussurance, if an officer has reasonable suspicion to believe that a driver has committed a violation, he may make a stop pursuant to that reasonable suspicion, even if he has not eliminated the possibility of the applicability of the statutory exception. If I understand this correctly, if we accept the premise that a person has the right to avoid police contact. So it's not a reasonable suspicion, and it's not, the officer is not having to have reasonable suspicion that the person is trying to avoid police conduct. He has to have reasonable suspicion of some criminal activity. So what's the difference in the totality of the circumstances if a person does this at 2 o'clock in the afternoon at a crowded checkpoint, well maybe a crowded makes a difference, but at a checkpoint as opposed to the middle of the night and there's no place else to go, he simply wants to avoid police contact. What's the difference in the reasonable suspicion of criminal activity? Your Honor, the difference is that as the United States Supreme Court noted in United States v. Cortez and Illinois v. Wardlow, the totality of the circumstances test deals with probabilities based on common sense conclusions about human behavior. So in the hypothetical you pose where it's 2.30 in the afternoon and it's a congested checkpoint, an innocent driver, the probability that there is an innocent reason for a driver to avoid the checkpoint increases, because he may want to avoid delay, the chances that he has been drinking at 2 o'clock and is now on the road is less, common sense would counsel, than it would be here at 1.15 in the morning on a Saturday. So those factors certainly change the weight of the evidence, but of course that is a decision for the officer to make in the moment. If there are no further questions, we would ask the court to reverse the judgment of the appellate court and affirm defendant's conviction and sentence. Thank you. Mr. Corrales. Good morning, Your Honor. Good morning. My name is Tom Corrales. I'm from the Office of the State Appellate Defender and I represent Jacob Timpson. Just to give you a little outline, I intend to address the first issue that the state has raised in this appeal. I'm happy to answer any questions you have about the alternative argument that they've presented, but I think there's enough to talk about with respect to the Terry analysis in this case. And I'm going to focus on a couple of themes that apply to our argument today. The first is that reasonable articulable suspicion that a crime is being committed is not the same as a general perception that something doesn't seem right here, even if that perception is a logical or sensible perception. That's not reasonable articulable suspicion of a crime. And then secondly, an encounter with the police when they don't have reasonable suspicion that you're committing a crime is optional. And so if that is optional, then exercising the option to not encounter the police can't become the reasonable suspicion that you're doing something illegal. Now there's an undeniable reality about what the police could not tell when they saw Jacob Timpson turn his truck around and head back toward Iowa. They could not tell why he had done that. They could speculate. They could make good guesses even. And they did find out later that he was unlicensed. His license was suspended. But of course, whenever one of these Fourth Amendment cases comes before this court, it's because someone was caught doing something illegal. And what I hope to convince your honors to think about today is what it will mean to those who are not guilty of anything if the police in this type of scenario are able to do what they want. And that's what they did in this case. Mr. Corrales, the appellate court seemed to focus on the fact that there was possible innocent explanations for the defendant's conduct. But isn't it always true that in a reasonable suspicion case that there will be possible innocent explanations for the defendant's conduct? Let me give you the second half of that. When would there be reasonable suspicion in a case such as this? Because, you know, keeping in mind that a reasonable suspicion is less than probable cause and considerably less than the preponderance of the evidence, how is there not at least a reasonable suspicion of criminal activity when, as we focused earlier in questions with the state, it happened at 1 a.m., a driver crosses a bridge into another state, but upon seeing a police roadblock ahead of him, turns around and drives back in the opposite direction. What additional fact would there have to have been to be reasonable suspicion? Well, if you were to review the cases from the states that say something more than just an apparent avoiding of going through the checkpoint is necessary, those courts would say, there does not need to be reasonable suspicion to tail someone, to pursue someone. But to get, for this to be reasonable suspicion of a crime, you're saying that you don't have the right to avoid the checkpoint. And those factors that you mentioned, the time and the place, that is all a factor of how the police decided to set this checkpoint up. They put that in place so that you won't be able to say that, you know, you wouldn't do this. There was no other place for him to turn around. So anybody who had forgotten a cell phone or a cell phone or a cell phone at the last place they were in Keokuk or gotten a call that there's an emergency at home, they couldn't do this without being tailed. How do you address what Justice Smith noted in his dissent? The quote is, as long as police can legally erect roadblocks, they have the ability to stop and briefly detain those attempting to avoid them. That's part of the analysis by the state as to reasonable suspicion, is that there's a roadblock here. And I think what Justice Smith was getting at, if we're going to allow roadblocks, it would seem odd that the police are allowed to stop the cars that proceed through a roadblock, eventually through a roadblock, but not those who, upon seeing the roadblock, turn around and head back in the opposite direction. Well, there is a difference to me between allowing roadblocks, tolerating roadblocks, and making sure that they're effective. There is no duty by this court to help the police make them effective. They're barely tolerated under the Constitution. The court in the United States Supreme Court has gone back and forth. When the city of Indianapolis v. Edmond came up, they restricted the checkpoint because it was designed to ferret out crime. And so they limited the number of roadblocks that could be allowed. And so that's a big difference. And we can say that roadblocks are limited to just road safety. And there can be other tactics employed by the police, some would say more effectively, than the use of roadblocks. So roadblocks are just by a hair allowed, and we don't have to help them work perfectly. And the cost here is something to consider. Again, there will be people caught up in the same scenario who will never come before a circuit judge, who will never have a roadblock. And we need to make sure that they're effective. We haven't appealed before in a public court or this court, because the officer just stopped them and checked and said, oh, well, you forgot your cell phone, or your mom just went in the hospital. Oh, go ahead. That's not a small price. That is not an insignificant little, well, we just have to live with that, because checkpoints are so important. They're not that important. They don't rise to that level of significance and honoring by this court, in my mind. They should not be that respected. Justice Schmid also acknowledged that, yes, innocent people might be caught up in that, because of course the police are not going to be able to know ahead of time which type of person they're dealing with. Well, that's what I think makes it not be reasonable suspicion of a crime. It's a generic suspicion. It's a belief that something doesn't feel right about this. That is enough to pursue that motorist. If their concern is that he might be intoxicated or impaired, we know from a lot of highway stop cases that it doesn't take much for an officer to figure out how to pull a car over that he wants to go and check out. But the important thing about this case is, in that scenario when an officer goes up to a car, let's say he has a valid objective basis for the stop, but his true interest is seeing if maybe there's something illegal in the car. When that officer asks the motorist, will you let me search your car, will you give me your consent, and is refused that consent, does that rise the level of suspicion? Of course it does. But it has to be honored. The same thing is true with someone who's merely indicating that they do not want to have this encounter with the police. They prefer to not go through the checkpoint. And until the police have something that indicates that they're up to something criminal, they have to honor that. And in a good number of the states, the courts have held that they need to observe something independent of the MIR Act, even if it's a defiant act, of avoiding the checkpoint before they can stop them. Now, we say that reasonableness is the touchstone of all Fourth Amendment inquiries, and we also look at the innocent person when we're using that test. Well, we have to acknowledge here that by their very existence, by definition, a roadside checkpoint does not entail suspicion. So we have to assume the innocent motorist is doing what they did when the police decided to go follow them. The fact that a checkpoint is in place should not be something that diminishes or erases the right of a person to go about their business, even if their business is nothing more than I don't want to talk to the police, I don't want to have an encounter with the police. And that's an important consideration that was highlighted by the concurring justice, not in this case, but in a Fifth District case that I cited in my brief, People v. Bray. And that's the case that involved the use of a phantom checkpoint, I think it was on Interstate 57, that warned motorists that it was coming and there was only one place to get off before the checkpoint was going to come up. And every person that took that exit saw that the police were at the end of that exit ramp. Now, State and I can quibble with what makes a fact pattern different, but at its core, both that case and this case are about the same thing. Having to give an officer who has, in part, contributed to the suspicious situation that you found yourself in, an explanation for the decision that you made. Now, Justice Keene wrote a concurring opinion, and he had this to say about the person who's in that predicament. A conscious decision to avoid the potential indiscriminate search, not unlike the refusal of a consent for a search, would not create reasonable suspicion of criminal wrongdoing, while the exercise of every constitutional right in the face of an official request to surrender it, raises official suspicion and heightens the belief that individual must have something to hide. The exercise of the right is not an act of evasion that authorizes its abrogation. And I have to comment on the use of the word evasion, because there's a subtle distinction between that and avoid. How are you evading the police when they're not possessing suspicion? When you're coming up to a checkpoint, there is no suspicion. They're barely tolerated. The Supreme Court allows them, but there is no suspicion. When you turn away, how can you be evading? I think that the word evading is the police already have suspicion, and they're already pursuing you. And so you can be guilty of eluding and evading the police. But I don't see how exercising a right is evading a mistake. Let me ask you this. Could you compare the argument you're making here to the facts in ward law? Well, ward law was a very close decision. Both the four-member dissent and the five-member majority said they did not want to have a per se rule. And so what became important to the totality of circumstances was the fact that they expected drug dealing to be going on, and the person ran hightail the other way. The state will call what my client did here, the motorist equivalent of headlong flight. But he didn't hightail it out of the scene. This was, if anything, the motorist equivalent of the exercise of the right not to have an encounter with the police. This is the same as walking away when an officer says, I'd like to talk to you. Implicit in that request is you don't have to. You can walk away. There's no motorist equivalent of headlong flight when you're not speeding. It is the motorist equivalent of not giving the police the opportunity to confirm that you're not hiding something. The key is that in ward law, there was testimony that this was an area with high narcotics trafficking. And you're saying here there's no reasonable suspicion of illegality at this point? Not because there's a checkpoint. Yes, I agree. I don't think a checkpoint... I'm not saying that's my position. Is that what you're saying? I agree with that. The existence of a checkpoint is not close to a high drug traffic or unsafe neighborhood because everybody has to go through it. Otherwise you'd be saying everybody's hiding something to make that the same as the high drug crime area in ward law. And making a U-turn, using a turn signal and just trying to quietly move the other way is not the same as headlong flight. It's simply the exercise of an option. Now it may be suspicious indication that you're avoiding the police. That's not Terry. There is no statute that says when the police ask you to talk to them, if you don't talk to them, you've now given suspicion of a crime. Otherwise, you wouldn't really have a right to say... Counsel, why would that be suspicion in itself when it's okay to avoid police? That's my point. It cannot be suspicion to just not agree to a request. The officer stops Mr. Timpson. If he doesn't ask for his license, he just says, I demand that you tell me why you didn't go through that checkpoint. He has no requirement of answering that question. I demand that I not answer. So, you know, it cannot be suspicion if it's something you have a right to exercise. And I just want to come back to where I was trying to start off here. And that is to urge you to consider the impact of this case on not just offenders of the law, but the non-offender too. Because if a person innocent of a crime is not a criminal offender, then that person is not a criminal offender. And if that person, without any wrongdoing, would have chosen to act in the same way Mr. Timpson did, given the place and time and layout of the road that the checkpoint was set up before, that person would have had the same thing happen to them that happened to Mr. Timpson. And that is not a small price or a minor intrusion on freedom. That type of reaction by the police was not sanctioned by the appellate court majority, and it should not be sanctioned by this court either. So for that reason, we ask that you affirm the decision of the appellate court. Are there any questions? I don't think so. Thank you. Your Honor, as the defendant did in his briefing, so he did here at the podium, assiduously avoiding the totality of the circumstances test under which he loses. But not evading, right? is a minimal intrusion. The police officer merely either confirms or dispels his suspicion of wrongdoing. In this case, checking license and registration would have sufficed. I agreed with the defendant that if the defendant was stopped and the officer asked him why he avoided the checkpoint, he would not have to give a reason. So that is not a point on which to hang the defendant's hat. Regarding the constitutionality of checkpoints, the constitutionality of the checkpoint here is not at issue. And in fact, checkpoints of this nature have longstanding approval of this court and the United States Supreme Court. The public interest in maintaining highway safety is a vital one, as the United States Supreme Court noted in Delaware v. Proust. So it is not something to be lightly tossed away. But again, the defendant resorts to this amorphous balancing test in place of the governing totality of the circumstances test, which as we established in our brief, is a basis to reverse the judgment of the appellate court. Preventing investigative stops of drivers like the defendant would significantly frustrate the efforts of police to serve the vital interest in maintaining highway safety, and we list numerous opinions so reasoning at pages 17 and 18 of our brief. Of course, there is a reduced expectation of privacy in an automobile, which makes this case an even easier one than it justifies the one in People v. Wardlow, which was a pedestrian case, of course. The defendant brings up an interesting juxtaposition in his brief by relying on the case of People v. Kipfer, in which a subject emerged from behind a dumpster, continued walking on his way despite a police officer's demand that he come back. The court there held that Kipfer was merely going about his business, he did not change his direction, much more plausible that he had an innocent motive and was simply exercising his right to ignore the police. Regarding the defendant's argument that there was simply a generic suspicion of crime in this case, that's what the reasonable suspicion requirement calls for. It doesn't call for suspicion of a specific crime, it calls for reasonable suspicion that criminal activity is afoot. As Justice Kaczynski reasoned in his concurrence in United States v. Montero-Camargo, turning around, U-turning, right before a police checkpoint gives rise to the reasonable inference that the individual taking the evasive action has caused fierce scrutiny. In other words, that he is doing something illegal and he wants to hide it from police. Avoidance of police is a completely reasonable factor to consider in the totality of the circumstances test. One of the police's main functions is the detection of criminal activity, and so one can reasonably infer from an attempt to avoid police the desire to conceal criminal activity. So for those reasons and the reasons in our briefs, your honors, if there are no further questions, we ask that the court reverse the decision of the appellate court and affirm the defendant's conviction sentence. Thank you. Thank you. Case number 118181, People of the State of Illinois v. Jacob D. Timpson, will be taken under advisement as agenda number four. Mr. Meyer, Mr. Corrales, thank you for your arguments this morning. You're excused at this time, and marshal the Supreme Court stands adjourned until 930 tomorrow morning.